**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE AXSOME THERAPEUTICS, INC. STOCKHOLDER DERIVATIVE LITIGATION | Master File No. 1:22-cv-6183 |

**VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiffs Daniel Engel and Kyle Guterba (together, "Plaintiffs"), by and through their undersigned attorneys, brings this amended verified derivative complaint for the benefit of nominal defendant, Axsome Therapeutics, Inc. ("Axsome" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants (defined below) breaches of fiduciary duties and contribution for Violations of Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, internal company documents obtained in response to a books and records demand on Axsome,[1] and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Axsome with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

**I.     NATURE AND SUMMARY OF THE ACTION**

1.     On April 25, 2022, Axsome—a New York-based biopharmaceutical company focused on developing novel treatments for central nervous system ("CNS") disorders—

---

[1]     The information included in those books and records is incorporated by reference in this Complaint.

announced that chemistry, manufacturing, and controls ("CMC") deficiencies would lead the United States Food & Drug Administration ("FDA") to reject its new drug application ("NDA" or "Application") for AXS-07, a product candidate for the acute treatment of migraine. Axsome reported that the FDA had identified CMC problems during its review and that the Company expected the FDA to issue a Complete Response Letter ("CRL" or "Response") "with respect to this NDA on or about the Prescription Drug User Fee Act target action date of April 30, 2022." These issues, at a minimum, significantly delayed approval while Axsome attempted to resolve the CMC deficiencies and resubmit the AXS-07 NDA. Following this disclosure, Axsome's stock price fell by approximately 22%.

2.      AXS-07 was one of the five core CNS programs in Axsome's portfolio and, at the time, the Company's closest product to potential commercial launch. As stated in Axsome's Form 10-K for the year ending December 31, 2020 ("2020 10-K"), the Company had completed two Phase 3 clinical trials and an additional open-label study for AXS-07. As of March 2021, Axsome represented that it "plan[ned] to submit an NDA for AXS-07 for the acute treatment of migraine." By no later than the end of the first quarter of 2021, the Individual Defendants knew or recklessly ignored that CMC obstacles were impairing the development of AXS-07. An NDA necessarily includes a CMC section addressing the drug's chemistry, manufacturing, and controls—elements essential to ensuring that commercial-scale production matches the specifications used in clinical settings.

3.      According to senior clinical trial personnel, one critical CMC failure arose from persistent equipment malfunctions at a contract manufacturing organization responsible for producing AXS-07. These problems persisted throughout 2021 and continued into the FDA's

review period in 2022. As a result, Axsome was unable to manufacture AXS-07 for an extended period during the critical window in which the FDA was evaluating its Application.

4.      The Individual Defendants  also knew that Axsome lacked the necessary supply of AXS-07 to support a planned clinical trial, forcing the Company to postpone the study multiple times. The manufacturer still had not resolved its equipment issues in early 2022. Because the supply disruption halted the trial—and because Axsome's manufacturing partners could not produce even limited quantities of AXS-07 for clinical use— the Individual Defendants recklessly disregarded these CMC failures, which culminated in the FDA's issuance of the CRL. Axsome's inability to manufacture AXS-07 at all reflected a severe deficiency squarely within the "chemistry, manufacturing, and controls" component of the AXS-07 Application.

5.      Clinical trial personnel further reported that the Individual Defendants prioritized profit over patients, cutting corners throughout the development process to hit milestones they knew, or recklessly disregarded, were not being met. The CMC issues affecting the AXS-07 NDA were not isolated: they marked the second time in short succession that the FDA had identified CMC problems in one of Axsome's NDAs. Axsome faced similar CMC obstacles while preparing its NDA for AXS-05, another core CNS program. Those issues caused additional delays and placed the Individual Defendants on notice of pervasive CMC risks across Axsome's NDAs.

6.      Despite their knowledge—or reckless disregard—of these CMC problems, the Individual Defendants misled investors. First, they spoke publicly about CMC matters as though they supported the AXS-07 NDA and failed to disclose the ongoing manufacturing breakdowns. Throughout the relevant time period, Axsome's SEC filings repeated the assertion that the Company's suppliers could provide adequate quantities of product, even though the supplier responsible for AXS-07 could not meet basic manufacturing needs.

7. Axsome consistently touted an unrealistic NDA submission timeline for AXS-07. the Individual Defendants repeatedly assured investors that the NDA would be filed in 2020, even though they knew that significant CMC hurdles remained unresolved. Contrary to those assurances, Axsome did not file the AXS-07 NDA until June 2021. Internal books and records produced to Plaintiffs show that ████████████████████████████████████ ██████████████████.

8. Throughout the relevant period, the Individual Defendants highlighted the results of AXS-07's clinical trials and their purportedly positive FDA interactions as evidence of a timely approval path. These statements were materially misleading because the Individual Defendants omitted the significant, and known, CMC issues that undermined AXS-07's development—issues so severe that Axsome could not manufacture the drug while its Application was under active FDA review.

9. When Axsome finally acknowledged the truth about the CMC failures affecting AXS-07, investors suffered substantial losses. Axsome's stock dropped 22% on April 25, 2022, after the Company disclosed the FDA's concerns that led to the rejection of the AXS-07 NDA.

10. These revelations precipitated the filing of a securities class action in this District against Axsome and certain of the defendants named herein, captioned *Gru v. Axsome Therapeutics, Inc., et al.*, Case No. 21-cv-3925 (the "Securities Class Action").

11. Plaintiffs did not make a litigation demand prior to filing this action because such action would have been futile based upon the composition of the Board and the actions taken by the Board, as alleged herein.

## II. JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiffs' claims raise a federal question under Section 10(b) of the Exchange Act, 15

U.S.C. § 78j(b) and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.[2]

13.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

15.     In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce,

---

[2]     The Company's forum selection clause is inapplicable to the instant Action because this Action asserts federal claims for which the Delaware Court of Chancery does not have jurisdiction to hear. Application of the Company's forum selection clause here would impermissibly foreclose Plaintiffs' Exchange Act claims. *See Seafarers Pension Plan v. Bradway*, 23 F.4th 714, 727-28 (7th Cir. 2022) (citing *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 962 (Del. Ch. Jun. 25, 2013)).

including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

**Plaintiffs**

16.    Plaintiff Daniel Engel purchased shares of Axsome stock in May 2021 and has continuously owned his Axsome stock since that date.

17.    Plaintiff Kyle Guterba purchased shares of Axsome stock in March 2021 and has continuously owned his Axsome stock since that date.

**Nominal Defendant**

18.    Nominal Defendant Axsome is a Delaware corporation with its principal executive offices located at 22 Cortlandt Street, 16th Floor, New York, New York 10007.  The Company's common stock trades on the NASDAQ exchange under the symbol "AXSM."

**Defendants**

19.    Defendant Herriot Tabuteau ("Tabuteau") has served as Chief Executive Officer ("CEO") and a director of the Company since its founding in January 2012. He is named as a defendant in the Securities Class Action.

20.    Defendant Nick Pizzie ("Pizzie") has served as the Company's Chief Financial Officer ("CFO") since May 2018.  He is named as a defendant in the Securities Class Action.

21.    Defendant Cedric O'Gorman ("O'Gorman") served as the Company's Senior Vice President of Clinical Development and Medical Affairs from September 2017 to September 2021. He is named as a defendant in the Securities Class Action.

22.    Defendant Kevin Laliberte ("Laliberte") served as the Company's Executive Vice President of Product Strategy from January 2021 to December 2021. He is named as a defendant in the Securities Class Action.

6

23. Defendant Roger Jeffs ("Jeffs") has served as a director of the Company since December 2014.

24. Defendant Mark Coleman ("Coleman") has served as a director of the Company since December 2014.

25. Defendant Mark Saad ("Saad") has served as a director of the Company since December 2014.

26. Defendants Tabuteau, Pizzie, O'Gorman, Laliberte, Jeffs, Coleman, and Saad are sometimes referred to hereinafter as the "Individual Defendants."

27. Defendants Tabuteau, Jeffs, Coleman, and Saad are collectively referred to herein as the "Director Defendants."

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

28. By reason of their positions as officers, directors, and/or fiduciaries of Axsome and because of their ability to control the business and corporate affairs of Axsome, at all relevant times, the Individual Defendants owed Axsome and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Axsome in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of Axsome and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Axsome and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Axsome, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive,

7

managerial, and directorial positions with Axsome, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

30.     To discharge their duties, the officers and directors of Axsome were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Axsome were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Company Background

31.     Axsome is a New York City–based biopharmaceutical company that develops novel therapies for CNS disorders with limited existing treatments. Defendant Tabuteau founded the Company in January 2012, and Axsome completed its initial public offering on the NASDAQ stock exchange on November 19, 2015.

32.     Among Axsome's five core CNS programs are AXS-07 and AXS-05. AXS-07 is an investigational, orally administered, rapidly absorbed, multi-mechanistic therapy for the acute

treatment of migraine, which Axsome classified as part of its "core CNS portfolio." AXS-05 is a therapy for major depressive disorder ("MDD").

33.     AXS-05 and AXS-07 were the first two Axsome product candidates for which the Company submitted NDAs to the FDA, making them its closest programs to potential commercial launch.

34.     Axsome pursued FDA approval for both AXS-05 and AXS-07 through the FDA's 505(b)(2) regulatory pathway. Under that pathway, an NDA "contains full reports of investigations of safety and effectiveness but where at least some of the information required for approval comes from studies not conducted by or for the applicant and for which the applicant has not obtained a right of reference."

35.     Before the misconduct, market analysts consistently viewed Axsome favorably based on the anticipated value of AXS-07, which was supported by Axsome's reported safety and efficacy data. For example, on December 30, 2019, a SunTrust Robinson Humphrey analyst— citing positive momentum—stated, "we think AXS-07 is approvable based on data reported this morning." SunTrust's $100 price target for Axsome stock relied primarily on the expected commercialization of AXS-05 and AXS-07. Likewise, on December 30, 2019, Cantor Fitzgerald raised its 12-month price target for Axsome from $104 to $125 per share based on favorable AXS-07 clinical results.

36.     While Axsome advanced its research programs, the Company stated in its Annual Reports prior to the misconduct that it did "not currently own or operate any manufacturing facilities for the clinical or commercial production of our drug candidates." Instead, Axsome relied on "independent contract manufacturing organizations, or CMOs," to produce its drug candidates and support clinical trials. Axsome reported that it "conduct[ed] periodic quality audits of" CMO

facilities and concluded that these CMOs "will be capable of providing sufficient quantities" of product "to meet our clinical trial supply needs."

### B.     AXS-07 Background

37.     At all relevant times, the Individual Defendants repeatedly assured investors that Axsome's AXS-07 NDA was progressing on a fast and orderly timeline. They highlighted favorable clinical results and characterized their FDA interactions as supportive of the Application. In reality, Axsome postponed the NDA submission multiple times. And once the Company finally filed the NDA, Axsome revealed that the FDA had identified CMC deficiencies—issues that would, at minimum, significantly delay any resubmission. As detailed below, the Individual Defendants knew or recklessly disregarded these AXS-07 CMC problems well before the misconduct began.

38.     Axsome described AXS-07 as "a novel, oral, rapidly absorbed, multi-mechanistic, investigational medicine under development for the acute treatment of migraine." The product incorporates "MoSEIC™, or Molecular Solubility Enhanced Inclusion Complex," combining meloxicam and rizatriptan in what Axsome called a "combination drug," defined as "a single drug product that consists of two or more active ingredients, with each component making a contribution to the claimed effect of the drug."

39.     "Meloxicam is a long-acting nonsteroidal anti-inflammatory drug, or NSAID" that provides "potent pain-relieving effects." Through Axsome's MoSEIC™ technology, AXS-07 "substantially increase[s]" the speed of meloxicam's onset "while potentially maintaining durability of action." Rizatriptan was included because it "may reduce the release of inflammatory mediators from trigeminal nerves" and "is approved as a single agent for the acute treatment of migraine."

10

40.     In February 2019, Axsome reported that it had reached agreement with the FDA on the design of the MOMENTUM (Maximizing Outcomes in Treating Acute Migraine) Phase 3 trial for AXS-07. According to Axsome, the FDA agreed that the trial protocol—covering entry criteria, dose selection, and endpoints—"adequately address[ed] objectives that, if met, will support filing of an NDA of AXS-07 for the indication of acute treatment of migraine in adults with or without aura."

41.     A Phase 3 study is the final stage of clinical testing before submission of an NDA. Phase 1 studies involve small groups (typically fewer than 100) and evaluate safety and dosage. Phase 2 studies involve larger cohorts to assess efficacy and further evaluate safety. Phase 3 trials test the drug in larger, controlled populations—often over longer durations—to assess comparative efficacy and confirm safety.

42.     Axsome began the MOMENTUM study in March 2019. On December 30, 2019, the Company announced that AXS-07 had met both regulatory co-primary endpoints. Axsome reported that AXS-07 "achieved co-primary and key secondary endpoints and significantly improved migraine pain, freedom from most bothersome symptoms, and sustained pain freedom, in the MOMENTUM study." Thus, by late 2019, the Individual Defendants knew that AXS-07 had met key safety and efficacy benchmarks supporting an NDA.

43.     Axsome told investors that MOMENTUM's results supported an NDA filing for AXS-07 for "the acute treatment of migraine." The Company further stated that "[b]ased on FDA feedback," it believed MOMENTUM would "be the only efficacy trial required to support an NDA filing for AXS-07 for the acute treatment of migraine," and that "Axsome plans to file the NDA in the second half of 2020."

44.     Defendant Tabuteau echoed this in the December 30, 2019 press release, stating: "[w]ith these positive [Phase 3] results, we look forward to filing an NDA for AXS-07 in the acute treatment of migraine in 2020."

45.     The Individual Defendants continued to represent that AXS-07 remained on this timeline and would be instrumental in enabling Axsome to reach commercial stage operations.

46.     Axsome also undertook a second Phase 3 trial, INTERCEPT, intended to further strengthen the AXS-07 NDA. The Company launched INTERCEPT in October 2019.

47.     In April 2020, Axsome announced that AXS-07 also achieved the co-primary endpoints in the INTERCEPT study. The Company then promoted the MOMENTUM and INTERCEPT data as additional support for the planned NDA. By early 2020, the Individual Defendants therefore knew that AXS-07 had demonstrated efficacy and safety in two Phase 3 clinical trials.

48.     Axsome additionally conducted a third Phase 3 trial—an open-label, long-term safety extension called MOVEMENT (Multimechanistic Treatment Overtime of Migraine Symptoms). As announced in a May 8, 2020 press release, Axsome stated this study would "further support the NDA filing" for AXS-07.

49.     In August 2020, Axsome announced that it had completed a successful Pre-NDA meeting with the FDA for AXS-07.

50.     On August 10, 2020, in its second-quarter 2020 update, Axsome stated that "we remain on track to submit the NDA for AXS-07 for the acute treatment of migraine in the fourth quarter." The Company added that it had completed enrollment in the MOVEMENT trial "to support the planned NDA filing" and represented that, "[a]s we move towards the filing of our

NDA[] in the fourth quarter . . . for AXS-07, our commercial team is focused on launch-readiness activities to ensure successful commercial execution."

51.    Despite these repeated assurances that an NDA submission in 2020 was imminent, Axsome unexpectedly announced on November 5, 2020—in its third-quarter 2020 results—that "Axsome now plans to submit the [AXS-07] NDA to the FDA in the first quarter of 2021, versus previous guidance of the fourth quarter of 2020, to allow for inclusion of supplemental manufacturing information to ensure a robust submission package." Having already met all Phase 3 efficacy and safety endpoints, the Individual Defendants attributed the delay to the need for additional manufacturing information. This admission reflects that, by no later than November 2020, the Individual Defendants knew that CMC and manufacturing issues were impeding the AXS-07 NDA submission.

52.    Axsome's 2020 10-K likewise highlighted that CMC matters were integral to the FDA approval process. Axsome stated that "[c]oncurrent with clinical trials, companies usually complete additional animal studies and must also develop additional information about the chemistry and physical characteristics of the product candidate as well as finalize a process for manufacturing the product in commercial quantities in accordance with cGMP requirements." The Company explained that "[t]he manufacturing process must be capable of consistently producing quality batches" and that manufacturers must establish methods for testing "identity, strength, quality, potency, and purity" of the product. Axsome stated that companies also must select and test packaging and conduct stability studies to ensure the product "does not undergo unacceptable deterioration over its shelf life."

53.    At the time, however, Axsome portrayed the manufacturing issue as a modest obstacle, suggesting it could cure the problem simply by providing "supplemental manufacturing

13

information" to the FDA. The Individual Defendants asserted that this would "ensure a robust submission package."

54.     Nevertheless, Axsome did not file the AXS-07 NDA until June 2021—months after its revised first-quarter 2021 timeline.

55.     On September 14, 2021, Axsome announced that the FDA had "accepted for filing the Company's New Drug Application (NDA) for AXS-07 for the acute treatment of migraine, and has set a Prescription Drug User Fee Act (PDUFA) target action date of April 30, 2022 for the NDA."

56.     In the accompanying press release, Defendant Tabuteau stated that "[t]he FDA's acceptance of the NDA for AXS-07 is an important milestone for Axsome as it brings us closer to potentially making this multi-mechanistic treatment available to migraine patients in need." The Individual Defendants added that "[w]e look forward to continued interactions with the FDA during the review process" and noted that the NDA "is supported by results from two Phase 3 randomized, double-blind, controlled trials of AXS-07 in the acute treatment of migraine, the MOMENTUM and INTERCEPT trials."

### C.     Axsome Receives Negative Feedback from the FDA About AXS-07

57.     ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



58.

59.

60.

---

3    *FDA Form 483 Frequently Asked Questions*, U.S. Food and Drug Administration, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions

4    *Information Requests and Discipline Review Letters Under GDUFA*, U.S. Food and Drug Administration (Oct. 2022), https://www.fda.gov/media/109915/download

5    Kevin Dunleavy, *With recent notices of 'deficiencies,' the FDA may be 'raising the regulatory bar': analyst*, Fierce Pharma (Apr. 13, 2022), https://www.fiercepharma.com/pharma/recent-notices-deficiencies-fda-may-be-raising-regulatory-bar-analyst

61.     The above correspondence was revealed and discussed by Defendants Tabuteau, Coleman, Jeffs, Saad, Pizzie, and Jacobson at the April 22, 2022 board meeting. AXSM_DERIV_0000661. However, "[n]o formal action was taken." *Id*.

62.     On April 25, 2022, before the market opened, Axsome announced that the FDA had informed the Company on April 22, 2022 "that chemistry, manufacturing, and controls ('CMC') issues identified during the FDA's review of the Company's New Drug Application ('NDA') for its AXS-07 . . . are unresolved. Based upon the time remaining in the NDA review cycle, the Company expects to receive a Complete Response Letter ['CRL'] with respect to this NDA on or about the Prescription Drug User Fee Act target action date of April 30, 2022." Following this disclosure, Axsome's share price dropped $8.60, or 21.99%, to close at $30.50 on April 25, 2022.

63.     That same day, William Blair issued a report describing the development as "obviously disappointing," noting that the stock was down 24% premarket and predicting a significant delay in AXS-07's approval.

64.     The April 25, 2022 announcement made clear that the FDA had previously alerted Axsome to the CMC deficiencies. Axsome's statement that the issues remained "unresolved" as of April 22, 2022 indicates that the FDA had earlier communicated these problems and had provided Axsome an opportunity to address them during the review period. Thus, the Company was not encountering these issues for the first time; rather, it had failed to resolve them after notice from the FDA. Despite that prior notice, April 22, 2022 was the first time Axsome disclosed to investors that the FDA had any concerns regarding the AXS-07 NDA.

16

65.     Regardless of when the FDA explicitly conveyed its concerns, the CMC problems existed much earlier in AXS-07's development and posed a substantial risk to approval long before the April 2022 disclosure.

66.     On May 2, 2022, Axsome announced that it had received the CRL for AXS-07. The Company stated that "[t]he CRL did not identify or raise any concerns about the clinical efficacy or safety data in the NDA, and the FDA did not request any new clinical trials to support the approval of AXS-07. The principal reasons given in the CRL relate to [CMC] considerations." Axsome further stated that "[t]he CRL identified the need for additional CMC data pertaining to the drug product and manufacturing process. Axsome believes that the issues raised in the CRL are addressable and intends to provide potential timing for a resubmission following consultation with the FDA." In short, Axsome could not provide any timeline for a resubmission.

**D.     Axsome Confronts CMC Issues Developing AXS-07**

67.     An NDA requires a detailed section addressing the drug's CMC, which governs how the product is manufactured and ensures that the material used in clinical testing matches the product intended for large-scale commercial production. FDA approval requires confirmation that the sponsor can manufacture the drug safely, consistently, and in accordance with the specifications demonstrated in clinical trials.

68.     As one contract research organization explains, "[a]fter clinical trials the scale up process must ensure that the larger batches of product are the same and meet the same specifications as the drug tested in the clinical trials. After the manufacturing process is qualified, lot release and in process testing will continue to take place."

69.     CMC compliance is therefore central to regulatory approval. Even if a drug appears safe and effective based on clinical data, it cannot be approved unless the sponsor demonstrates an ability to reproduce the product at scale without compromising quality.

17

70.     Axsome's AXS-07 development suffered from persistent CMC problems. After the FDA issued the CRL for the AXS-07 NDA, Defendant Tabuteau stated during the Company's May 2, 2022 first-quarter earnings call that "[t]he principal reason given in the CRL relate to chemistry, manufacturing and controls or CMC considerations. The CRL identified the need for additional CMC data pertaining to the drug product and manufacturing process. We believe that all the issues raised in the CRL are addressable." Although he continued to emphasize AXS-07's efficacy and safety, he did not provide any concrete timeline for a new NDA submission, stating only: "[w]e intend to provide potential timing for a resubmission following consultation with the FDA."

71.     Later on the same call, in response to a question seeking more detail about the CRL, Defendant Jacobson explained that "the questions and the request for additional information, they principally relate to drug product and the manufacturing process. So just a reminder that AXS-07 incorporates our MoSEIC technology, with a novel technology that Axsome developed." He added that the MoSEIC process "does increase the complexity of the manufacturing process," and therefore "we understand the basis for many of the questions, and we do believe they're addressable." His remarks reflect the Individual Defendants' awareness—well before submitting the NDA—of the complexity of AXS-07's manufacturing process.

72.     Tabuteau also acknowledged publicly, once the CMC deficiencies became known, that "we fully understand the reasons why the [FDA] would want to make sure that any new technology, any new manufacturing process is fully vetted."

73.     Regarding timing, Tabuteau stated: "[w]hat we're looking to do is to meet with the FDA as expeditiously as possible. That's a Type A meeting. We want to make sure that we get our ducks in a row prior to requesting that meeting and getting a date. Once we have that meeting and

18

we get feedback from the agency. In other words, we confirm exactly what it is that should go into the resubmission that we can have success, then we'll be in a position to provide you with updated guidance on timing." He added that the Company expected the resubmission "would likely be treated as a Class II resubmission, leading to a six-month review."

74. When asked whether the CRL raised any issues beyond CMC, Tabuteau stated it dealt "principally with all CMC" but also included "one item related to non-clinical, which was just our quest for additional information, which we believe we can provide. So for us, the real focus is this is a stand [stet] focus is CMC." Thus, the CRL identified at least one non-CMC deficiency that Axsome did not explain.

75. While the Individual Defendants were vague in their public disclosures as to the nature of the CMC problems that the FDA identified with AXS-07, Confidential Witness 1 ("CW 1")[6] a former employee, who was a Senior Clinical Trial Manager at Axsome from July 2019 to February 2022, provided details of what the issues were.

76. CW 1 reported to the Executive Director of Clinical Research (Amanda Jones), the Director of Clinical Operations (Cheryl Askew), and the Senior Director of Clinical Operations (Caroline Streicher) at various points during CW 1's tenure at the Company. CW 1 was based in Axsome's New York City office.

77. In early 2021, CW 1 was tasked to start managing a new study to provide additional data for AXS-07 that was scheduled to begin at the end of April 2021. The purpose of this study was to support the marketing of AXS-07 with additional published data. Manufacturing issues,

---

[6]   All references to Confidential Witness 1 ("CW 1") and the statements attributable to them are taken from the Securities Class Action and are based upon information and belief. The court in the Securities Class Action found that the allegations regarding CW 1 support the probability that they "would possess the information alleged" and were thus "accepted as true." Securities Class Action, ECF No. 90, at 7.

however, forced the Company to delay that study first until August 2021 and then until November 2021. Axsome did not have a sufficient supply of AXS-07 for the study.

78.    As the start of the study approached in early 2021, Axsome's available AXS-07 supply neared expiration. This forced the Company to arrange for production of more for the study. According to CW 1, around August 2021, Fang Liu, Axsome's Senior Director of Supply Chain for AXS-07, told CW 1 directly that one of the contract manufacturing organizations that Axsome contracted with to produce AXS-07 was having equipment problems and was therefore unable to manufacture the drug.

79.    CW 1 recounts that Liu reported to Defendants Jacobson and Laliberte. In her role as the point person at Axsome regarding the supply of AXS-07, CW 1 recalls that Liu was aware of the manufacturing problems, dealt with supply delays of the drug due to the equipment issues, and provided updates to Jacobson and Laliberte about the status of drug supplies.

80.    According to CW 1, in the summer of 2021, Axsome conducted an internal audit of its CMC operations and manufacturing facilities. CW 1 understood that the audit was done in preparation of the FDA's review as part of the NDA process for AXS-07 and AXS-05.

81.    Also according to CW 1, equipment problems at the manufacturing facilities were raised in the audit. Defendant Laliberte was further aware of these problems as he was directly involved in Axsome's response to the audit's results. CW 1 recalls an internal meeting where Laliberte affirmatively discussed Axsome's equipment issues that were raised in the internal audit.

82.    As the months passed, Axsome continued to wait for the necessary supply of AXS-07. With AXS-07's continued unavailability, the Company delayed the study again, this time planning to conduct it in early 2022. At that point, Liu told CW 1 again that the manufacturer was

still having equipment problems that it was not able to resolve. These problems therefore persisted at least from April 2021 through when CW 1 left the Company in February 2022.

83.     According to CW 1, Axsome used one vendor to supply meloxicam and another vendor to supply rizatriptan, which are the two active ingredients in AXS-07. Axsome then used a third vendor to combine the two products to make AXS-07. It was this third vendor that could not produce AXS-07, having problems with the equipment used to combine the two ingredients.

84.     CW 1 recounts that the whole supply of AXS-07 for trial and commercial uses was manufactured at the same facility. CW 1 understood that the manufacturing delay due to the equipment problems delayed Axsome's entire supply of AXS-07, not just batches that were intended for use in trials. Liu told CW 1 that Axsome was waiting for the vendor to fix the equipment and was not trying to find a new vendor to manufacture the drug.

85.     According to CW 1, the CMC issues that the FDA identified in its CRL for AXS-07 involved this contract manufacturing organization's equipment problem. Further, according to CW 1, Axsome's executive management would have known about the CMO's equipment problems.

86.     In addition, executive management's knowledge or reckless disregard of CMO problems comports with the manufacturing problems as CW 1 understood them. CW 1 observed that the Company was not able to produce one of its core drug candidates, which was one of only two drugs for which the Company was in the process of submitting NDAs. This delay went on for an extended period of time and caused a trial that Axsome was working on to be delayed indefinitely. Axsome's senior management would have known of this delay that made the Company completely unable to manufacture, or conduct studies on, one of its main products for an extended period of time.

87.     AXS-07's manufacturing issues reflected broader quality-control failures. Internal reports, including from CW 1, described a leadership culture that appeared to prioritize profit and milestone achievement over proper development, resulting in corner-cutting practices.

88.     One such CMC problem involved AXS-07's stability testing. On September 29, 2022, Axsome issued a press release announcing that, after a "Type A" meeting with the FDA, it intended to resubmit the AXS-07 NDA by the third quarter of 2023. The release stated:

89.     "The purpose of the Type A meeting was to obtain the FDA's feedback and agreement on the Company's plan to address the issues raised in the previously received Complete Response Letter (CRL) to support a resubmission of the AXS-07 NDA. The issues principally related to chemistry, manufacturing, and controls (CMC) considerations. Based on the FDA feedback, the Company will include new CMC information, including stability data on newly manufactured commercial scale batches of AXS-07, in its resubmission package. The resubmission package may also include additional clinical pharmacology information. The Company expects the NDA resubmission to be designated as Class 2 which would be subject to a six-month review. No additional clinical efficacy or safety trials have been requested by the FDA for a resubmission of the NDA."

90.     "We are very pleased with the outcome of the Type A meeting which clarifies our approach to resubmitting the NDA for AXS-07 for the acute treatment of migraine," said Herriot Tabuteau, MD, Chief Executive Officer of Axsome. "We appreciate the FDA's thoughtful engagement and look forward to a successful resubmission."

91.     During the Company's November 7, 2022 earnings call, Defendant Jacobson responded to a question about timing by noting that "FDA asked for a number of things from us, with respect to CMC, including stability data on new batches that had already been made, or are

being made." He explained that "stability data . . . is used to assess and inform the shelf life of an

approved product," that typical ICH guidelines require testing "at room temperature and

accelerated conditions," and that these protocols "cannot be sped up." He continued: "[a]nd so,

typical times are 0, 1 month, 6 months, 12 months, et cetera," concluding that the Company simply

had to complete the process and "generat[e] those data."

92.     It was thus acknowledged that the CMC issues cited in the CRL were multifaceted

and included stability testing on new commercial-scale batches. They also recognized that ICH

stability requirements typically extend up to twelve months or longer and cannot be accelerated.

93.     Despite this, Axsome's risk disclosures—including in its Form 10-Q for the quarter

ended March 31, 2021 ("1Q2021 10-Q")—described such risks only generically. For example,

Axsome warned that:

> We may also experience numerous unforeseen events during, or as a result of,
> clinical trials and in the course of our preparation, submission, and review of NDA
> filings that could delay or prevent our ability to receive marketing approval or
> commercialize our product candidates, including:
>
> ***
>
> [I]n connection with the chemistry, manufacturing, and controls (CMC) data
> necessary for our NDA filing and approval, we will need to conduct stability studies
> and provide stability data to establish appropriate retest or expiration dating period;
> applicable to all future drug substance and drug product batches manufactured,
> packaged, and stored under similar circumstances, to establish the long-term
> storage conditions, and to provide evidence of the effect of various environmental
> conditions on the quality of the drug substance and drug product. Our product
> candidates may not demonstrate sufficient long-term stability to support an NDA
> filing or obtain approval, or the product shelf life may be limited by stability
> results[.]

94.     The 1Q2021 10-Q also warned that manufacturing delays or failures by third-party

suppliers could postpone development or commercialization:

> We do not manufacture any of our product candidates, and we do not currently plan
> to develop any capacity to do so. We currently outsource all manufacturing of our

product candidates to third parties typically without any guarantee that there will be sufficient supplies to fulfill our requirements or that we may obtain such supplies on acceptable terms. Any delays in obtaining adequate supplies with respect to our product candidates may delay the development or commercialization of our product candidates.

95.    It continued with extensive boilerplate warnings regarding manufacturing capacity, supply constraints, reliance on CMOs, potential breaches of supply agreements, delays in obtaining adequate quantities of product candidates, and risks that manufacturing problems could impair FDA approval or commercial launch.

96.    Before the misconduct alleged herein, having shown AXS-07's efficacy and safety in two Phase 3 trials, Defendants Tabuteau and Jacobson routinely emphasized Axsome's attention to CMC requirements necessary for NDA preparation. For example, in Axsome's December 30, 2019 press release announcing positive MOMENTUM results, Tabuteau stated: "[t]hese data have potentially important implications for patient care based on the high rate of inadequate response to and patient dissatisfaction with current treatments. With these positive results, we look forward to filing an NDA for AXS-07 in the acute treatment of migraine in 2020."

97.    On March 12, 2020, Axsome issued a press release reporting fourth-quarter and full-year 2019 results and reiterating its plan to file the AXS-07 NDA "in the fourth quarter of 2020." During the earnings call that day, Tabuteau again promoted the MOMENTUM results, stating: "With . . . two planned NDA filings Axsome is on track to transition to commercial stage potentially as early as next year."

98.    That same day, Axsome filed its 2019 Form 10-K, signed by Defendants Tabuteau and Pizzie, describing the Company's reliance on CMOs and its belief that existing suppliers "will be capable of providing sufficient quantities" for clinical supply needs. The filing also included standard statements warning that failures by CMOs could delay development, impede supply,

24

hinder commercialization, or limit Axsome's ability to compete—without identifying any specific or existing CMC problems affecting AXS-07.

99.    On April 6, 2020, Axsome issued a press release promoting INTERCEPT's successful primary endpoints and stating that the results "strengthen[ed] our planned NDA for AXS-07 . . . which remains on track to be submitted to the FDA in the fourth quarter." On May 8, 2020, Axsome again reported it was "on track" to submit the NDA in the fourth quarter of 2020.

100.    Later on May 8, during an earnings call, an analyst asked whether "any new clinical data, including . . . CMC activities" might affect Axsome's planned NDA filings. Defendant Tabuteau responded: "With regards to CMC activities, there are registration batches which are being manufactured now. A good thing for us is that we have been manufacturing our clinical trial supply at commercial scale and also at the same CMO that we're using for commercial production. So, there's no scale up that needs to be done."

101.    He added: "Now, with regards to manufacturing and any kind of science to it, there's always tweaks and experimentation, but I would say that there is no rate-limiting step and there is no extensive experimentation. This is simply manufacturing our registration batches for regulatory purposes."

102.    On August 10, 2020, Axsome issued a press release reporting its second quarter 2020 results and reiterating that it remained "on track to submit an NDA for AXS-07 . . . to the FDA in the fourth quarter of 2020," citing positive Phase 3 efficacy data as support for the Application.

103.    Later that day, Axsome held its second quarter 2020 earnings call. Defendant Tabuteau stated in his prepared remarks that the Company continued "to advance our . . . AXS-07 product candidate[] towards NDA submission[] in . . . migraine[.]" He confirmed that Axsome

25

"remain[s] on track to submit the NDA for AXS-07 . . . in the fourth quarter," adding that "[a]s we move towards the filing of our NDA[] in the fourth quarter . . . for AXS-07, our commercial team is focused on launch-readiness activities to ensure successful commercial execution." His comments demonstrated Axsome's attention not only to safety and efficacy, but also to the manufacturing and commercial elements of the forthcoming NDA.

104.    On November 5, 2020, Axsome issued a press release announcing that "Axsome now plans to submit the [AXS-07] NDA to the FDA in the first quarter of 2021, versus previous guidance of the fourth quarter of 2020, to allow for inclusion of supplemental manufacturing information to ensure a robust submission package." By this point—despite having positive safety and efficacy results from two Phase 3 trials— the Individual Defendants knew that CMC issues were delaying the AXS-07 NDA. Nevertheless, the press release continued to reassure investors about AXS-07's progress, adding that "[p]re-submission activities for the Company's NDA for AXS-07 in the acute treatment of migraine are progressing with major NDA-related items on track for completion by year-end." The release quoted Defendant Tabuteau as stating: "[o]ver the past several months, we continued to advance our . . . AXS-07 product candidate[] towards NDA submission[] in . . . migraine, and intensified our commercial launch readiness activities," and "[w]e anticipate an active next few months as we complete our NDA submission[] for . . . AXS-07[.]"

105.    Axsome also held its third quarter 2020 earnings call on November 5, 2020. In his remarks, Defendant Tabuteau again stated that the Company was taking steps to ensure a robust AXS-07 NDA, particularly with respect to manufacturing. He confirmed: "the major [NDA] related items are on track for completion by year end. We now plan to submit the NDA in the first quarter of 2021 versus previous guidance of the fourth quarter of 2020 in order to allow for

inclusion of supplemental manufacturing information. We believe that this approach will enhance the robustness of our submission."

106.    During the same call, responding to questions about the additional manufacturing information Axsome would include in the NDA, Defendants Tabuteau and Jacobson attempted to minimize any suggestion of manufacturing problems. When asked about submitting "extra manufacturing information," Tabuteau stated that Axsome would "have completed all the major activities" needed to file by year-end and remained "on track to do that." He explained that "because of the unique manufacturing, behind the MoSEIC technology, we want to make sure that we have as robust as possible of a submission package. So we continue to generate data." He attributed the delay to Axsome's desire to include additional early-year manufacturing data in the NDA, stating: "since . . . we will be having some data in the early part of the year, we'd love to be able to include that in the package."

107.    Defendant Jacobson echoed this message, asserting: "[s]o just want to be clear, this is not the result of the manufacturing or stability issue or anything like that." Instead, he stated that Axsome expected new data that "would add to the submission given us a novel delivery technology," allowing the Company "to make the package as robust as possible."

108.    In response to an analyst's follow-up question seeking specifics about "manufacturing data related to the MoSEIC platform," Tabuteau stated that the additional information was "standard information when you manufacture additional batches." He noted that Axsome "continue[s] to manufacture additional batches of drugs" and that although "we already have very long-term stability data on other batches," obtaining more data would "help to make the submission robust and assure that there are no hiccups during review." These statements confirmed that the Individual Defendants possessed detailed knowledge of AXS-07 manufacturing issues.

27

109.    On March 1, 2021, Axsome released its fourth quarter and full-year 2020 results. Defendant Tabuteau stated in the press release that "[w]e had successful pre-NDA meetings with the FDA . . . for AXS-07 in migraine," and that Axsome was "nearing submission of the NDA for AXS-07 in the acute treatment of migraine, which is expected early in the second quarter." He further stated that "[o]ur focus for the remainder of the year will be on the regulatory activities surrounding these NDAs, [and] launch readiness to ensure a successful transition to commercialization[.]"

110.    Axsome held an earnings call that same day. When asked why the AXS-07 NDA would now be submitted in the second quarter of 2021, Defendant Tabuteau responded: "With regard [AXS-]07 and the NDA filing the team remains on track to complete the filing by the end of the quarter. However, we are waiting on one vendor report which will slip into very beginning of the second quarter and that's the reason[.]"

111.    The Individual Defendants knew that Axsome would "need to conduct stability studies" and supply stability data, yet they omitted that the Company's manufacturing facility— used for both clinical and commercial production—was down, leaving Axsome unable to manufacture additional AXS-07 batches. As of early 2021, Axsome's remaining supply of AXS-07 was nearing expiration, and because of equipment failures, the Company could not produce new batches required for stability studies. Under ICH guidelines, stability testing requires at least six to twelve months—and often longer—to complete.

112.    Thus, the Individual Defendants lacked the time necessary to complete stability studies on new batches before submitting the AXS-07 NDA. Axsome stated on March 1, 2021, that it expected to submit the NDA in the second quarter of 2021 and ultimately submitted in June 2021. But certain Individual Defendants "cut[ ] corners" by filing the NDA without the ability to

28

manufacture additional AXS-07 batches and without having begun stability studies on new batches.

113. This conclusion follows from: (1) the statements acknowledging the need for stability studies on new AXS-07 batches; (2) the Company's prolonged manufacturing shutdown from at least April 2021 through February 2022, when CW 1 left Axsome; (3) the FDA's description of the AXS-07 CMC issues as "unresolved" when it rejected the NDA in April 2022; and (4) the admissions in September and November 2022 that the FDA required "stability data on newly manufactured commercial scale batches of AXS-07" for the NDA resubmission.

**E.    Problems with AXS-05 Put the Individual Defendants on Notice of CMC Problems**

114. The Individual Defendants should have been especially alert to CMC risks with AXS-07 because Axsome had already confronted similar issues with its other core product, AXS-05 for the treatment of MDD. Investors reasonably expected that the Company would not repeat the same error on its next NDA and were stunned when Axsome encountered back-to-back CMC failures on two consecutive filings.

115. Analyst commentary underscored this reaction. On April 25, 2022, Cantor Fitzgerald lowered its price target for Axsome following news of the FDA's rejection of the AXS-07 NDA, describing the situation as "déjà vu." The firm explained: "[t]he Company ran into regulatory issues for its NDA of '05 for MDD as the agency had identified two deficiencies related to analytical methods in the CMC which needed to be addressed prior to the FDA taking action on the NDA. Although we had previously indicated that we believe these CMC issues have been resolved, our conviction that that is the case is now decreased as CMC deficiencies appear to be a persistent issue plaguing the company."

116. Cowen similarly advised investors to "[r]ecall that the company had previously indicated that the FDA expected to complete the required inspection of the AXS-07 contract manufacturing facility prior to the April 30 PDUFA date and the company had not communicated any other delays with the review prior to today, thus the update comes as a disappointment. Additionally, given the history of the AXS-05 review in MDD, investors are likely not to take kindly to any uncertaint[y] between the company and the FDA."

117. On the same day, Morgan Stanley issued a report titled "Surprise Setback for AXS-07 in Migraine Presents Additional Pipeline Uncertainty." It stated that "the surprise setback for AXS-07 is likely to increase investor uncertainty regarding prospects for the AXS-05 NDA – particularly given the hurdle faced by both applications are CMC related." Morgan Stanley predicted "significant pressure on AXSM following the update on AXS-07" and kept an EW rating pending its review of the Company's price target. It identified "FDA rejection of Axsome's NDA for AXS-07 in migraine" as one of the primary risks to the Company.

118. Likewise, the SMBC Group issued a note titled "More Storm Clouds Gathering with Pending Rejection for AXS-07 in Migraine," stating that Axsome's 22% stock drop was "appropriate" given the negative news. The firm forecast a "sizable delay" in AXS-07's approval and launch and reduced its price target from $45 to $29 per share. SMBC Group added that regardless of whether AXS-07's CMC deficiencies were "related to some of the problems that have been encountered previously with" AXS-05, "troubles in manufacturing seem to be a recurring theme with AXSM's drug candidates."

119. Axsome developed AXS-05 for MDD and other indications, noting that it "believe[s] there is a substantial need for new, more effective treatments for this large, underserved

patient population." The Company described AXS-05 as "a novel, oral, investigational NMDA receptor antagonist with multimodal activity."

120. In July 2020, Axsome announced a positive pre-NDA meeting with the FDA for AXS-05 in MDD. The Company submitted that NDA in early 2021.

121. On April 26, 2021, Axsome announced that the FDA accepted the AXS-05 NDA for priority review, shortening the review period from the standard ten months to six months and setting a PDUFA date of August 22, 2021. Axsome stated that "[t]he NDA is supported by results from two randomized, double-blind, controlled trials of AXS-05 in patients with a confirmed diagnosis of moderate to severe MDD."

122. Then, on August 9, 2021, less than two weeks before the PDUFA date for AXS-05 and just over a month before Axsome submitted the NDA for AXS-07—the Company unexpectedly disclosed that the FDA had identified "deficiencies" in the AXS-05 NDA. Axsome stated that "[a]s part of the ongoing review of our NDA for AXS-05, the FDA recently notified us that they have identified deficiencies that preclude labeling discussions at this time." It added: "[w]e are attempting to learn the nature of these deficiencies with the goal of addressing them, however, this development may lead to a delay in the potential approval of AXS-05."

123. The press release further explained that "[o]n July 30, 2021, the Company received a letter from the FDA stating that it has identified deficiencies that preclude discussion of labeling and post-marketing requirements/commitments at this time." With respect to approval timing, Axsome stated: "[t]he letter stated further that the notification does not reflect a final decision on the information under review. The letter did not state what the deficiencies are." The FDA defines post-marketing requirements and commitments as "studies and clinical trials that sponsors conduct after approval to gather additional information about a product's safety, efficacy, or optimal use."

124. During the August 9, 2021 earnings call, Defendant Tabuteau acknowledged that although the FDA's notice did "not reflect a final decision," it "may lead to a delay in the potential approval of AXS-05."

125. Investor reaction was severe. Guggenheim Securities issued a report titled "AXS-05 approval now in question after FDA letter noting 'deficiencies' in the NDA filing." On August 9, 2021, Axsome's stock price fell 46.5%, dropping from $51.16 per share to $27.37.

126. From this point forward, the Individual Defendants were aware that, despite positive Phase 3 safety and efficacy data, the FDA might deny Axsome's NDAs due to CMC issues. At the time, AXS-07 was the only other Axsome product with an NDA under review. While Axsome could address the AXS-05 CMC deficiencies under that NDA, the CMC issues with AXS-07 were far more severe, resulting in a CRL. the Individual Defendants publicly claimed that the Company was attentive to CMC concerns following the AXS-05 deficiencies.

127. On August 23, 2021, Axsome updated investors, stating that the FDA "informed the Company in a teleconference on August 20, 2021, that its review of the new drug application (NDA) for AXS-05 for the treatment of major depressive disorder would not be completed by the PDUFA target action date of August 22, 2021. The FDA did not request additional information from the Company, and the review of the application is ongoing."

128. On November 8, 2021, during Axsome's third quarter 2021 earnings call, Defendant Tabuteau disclosed that the FDA "recently informed us of two deficiencies related to analytical methods in the chemistry, manufacturing and control section of the NDA [for AXS-05], which must be addressed prior to the FDA taking action on the NDA."

**F.     The Individual Defendants Cause the Company to Issue Materially Misleading Statements**

129.    On December 30, 2019, the Individual Defendants caused Axsome to issue a press release announcing that AXS-07 had met its two co-primary endpoints in its Phase 3 trial called MOMENTUM for the treatment of migraine. In relevant part, the press release stated that "[t]he positive results on both co-primary endpoints along with the demonstration of component contribution support the filing of an NDA for AXS-07 in the acute treatment of migraine." It also stated that "[b]ased on FDA feedback, Axsome believes that MOMENTUM will be the only efficacy trial required to support an NDA filing for AXS-07 for the acute treatment of migraine." As a result, the Company planned to file its NDA in the second half of 2020.

130.    On March 12, 2020, the Individual Defendants caused Axsome to report its fourth quarter and full year 2019 financial results, reiterating that "[t]he positive results from the MOMENTUM trial support an NDA filing for AXS-07 in the acute treatment of migraine, which is anticipated in the fourth quarter of 2020." To support this NDA, "enrollment in a Phase 3 open-label, long-term safety extension study of AXS-07 is ongoing."

131.    The same day, the Company held a conference call in connection with the fourth quarter and full year 2019 financial results. During the call, defendant Tabuteau stated:

> The positive results from the MOMENTUM trial support an NDA filing for AXS-07 in the acute treatment of migraine and we remain on track to file this NDA in the second half of 2020. With . . . two planned NDA filings Axsome is on track to transition to commercial stage potentially as early as next year.

132.    The same day, the Individual Defendants caused Axsome to file its annual report on Form 10-K with the SEC for the period ended December 31, 2019 (the "2019 10-K"). It included only generic, boilerplate representations about regulatory approval, including that "the FDA may refuse to approve an NDA if the applicable regulatory criteria are not satisfied or may require additional . . . [CMC], or other data and information."

33

133.    On April 6, 2020, the Individual Defendants caused Axsome to issue a press release announcing that AXS-07 met its co-primary endpoints in a second Phase 3 trial called INTERCEPT for the treatment of migraine, stating in relevant part:

> In the trial, AXS-07 met the co-primary endpoints of freedom from migraine pain and freedom from most bothersome symptoms as compared to placebo. AXS-07 is Axsome's novel, oral, multi-mechanistic investigational medicine for the acute treatment of migraine. . . .
>
> ***
>
> "We are very pleased with the strong results of the Phase 3 INTERCEPT trial, which confirm the superior and durable efficacy of AXS-07. The prevention of migraine pain progression, and the substantial increase in the rate of pain freedom demonstrated with early treatment with AXS-07, expand and enhance its differentiated profile for the acute treatment of migraine," said Herriot Tabuteau, MD, Chief Executive Officer of Axsome. "With INTERCEPT and the previously completed MOMENTUM Phase 3 trial in patients with a history of inadequate response to prior acute treatments, AXS-07 has now been evaluated in two positive well-controlled trials. These trials demonstrate the efficacy of AXS-07 against potent active and placebo comparators, across a spectrum of migraine attack settings, regardless of the timing of migraine treatment, disease severity, or baseline pain intensity. INTERCEPT strengthens our planned NDA for AXS-07 in the acute treatment of migraine, which remains on track to be submitted to the FDA in the fourth quarter."

134.    On May 8, 2020, the Individual Defendants caused Axsome to announce its first quarter 2020 financial results in a press release that stated, among other things:

- **Migraine**: Axsome remains on track to submit an NDA for AXS-07 in the acute treatment of migraine to the FDA in the fourth quarter of 2020. The NDA is supported by positive efficacy results from the MOMENTUM and INTERCEPT trials. A Phase 3, open-label, long-term safety extension study of AXS-07 is ongoing to further support the NDA filing. To date, more than 700 patients have been dosed in this trial.

135.    The same day, the Company held a conference call in connection with the financial results. During the call, an analyst asked whether there was any new clinical data, including as to CMC activities, for the Company's NDAs. In response, Defendant Tabuteau stated, in relevant part:

34

With regards to CMC activities, there are registration batches which are being manufactured now. A good thing for us is that we have been manufacturing our clinical trial supply at commercial scale and also at the same CMO that we're using for commercial production. So, there's no scale up that needs to be done.

Now, with regards to manufacturing and any kind of science to it, there's always tweaks and experimentation, but I would say that there is no rate-limiting step and there is no extensive experimentation. This is simply manufacturing our registration batches for regulatory purposes.

136. On May 11, 2020, the Individual Defendants caused Axsome to file its quarterly report on Form 10-Q for the period ended March 31, 2020. It included only generic, boilerplate representations about regulatory approval, including that "in connection with the [CMC] data necessary for our NDA filings, we will need to conduct stability studies and provide stability data to establish appropriate retest or expiration dating period" and that "[d]uring the course of review, the FDA may also request or require additional CMC, or other data and information, and the development and provision of these data and information may be time consuming and expensive."

137. On August 10, 2020, the Individual Defendants caused Axsome to announce its second quarter 2020 financial results in a press release, stating in relevant part:

Axsome remains on track to submit an NDA for AXS-07 in the acute treatment of migraine to the FDA in the fourth quarter of 2020. The NDA is supported by positive efficacy results from the MOMENTUM and INTERCEPT trials.

Enrollment has been completed in the MOVEMENT (Multimechanistic Treatment Overtime of Migraine Symptoms) Phase 3 open-label, long-term safety trial to support the planned NDA filing of AXS-07 in the acute treatment of migraine. More than 700 patients have been enrolled, approximately 450 of whom have been treated with AXS-07 for at least 6 months to date.

138. The same day, the Company held a conference call in connection with the financial results. During the call, Defendant Tabuteau stated, in relevant part:

Over the past several months, we continued to advance our . . . AXS-07 product candidate[] towards NDA submission[] in . . . migraine[.]

\*\*\*

35

[W]e remain on track to submit the NDA for AXS-07 for the acute treatment of migraine in the fourth quarter. To that end, we have completed enrollment in the Phase 3 open-label safety extension trial of AXS-07 in migraine, which we call the MOVEMENT study to support the planned NDA filing. As we move towards the filing of our NDA[] in the fourth quarter . . . for AXS-07, our commercial team is focused on launch-readiness activities to ensure successful commercial execution.

139.    The above-referenced statements were materially misleading because they failed to disclose: (1) that the Company failed to adhere to proper CMC practices for its AXS-07 manufacturing process; and (2) that, as a result, there was a substantial risk to approval of the AXS-07 NDA.

### G.    The Board Knew the Truth

140.    At all relevant times, the Board were kept apprised of AXS-07's developments, NDA filings, and discussions with the FDA. Despite this, the Director Defendants permitted and/or failed to correct the foregoing false and misleading statements. Further, the Board were constantly kept up-to-date with the FDA's communications and issues with the NDA process, such as when the Company received ██████████ following site inspections, or when the Company received █ ██████. However, in the face of these red flags, the Board continuously failed to take any corrective action, resulting in the Company suffering harm.[7]

141.    On June 4, 2021, a Board meeting was held in which Defendants Tabuteau, Coleman, Jeffs, and Saad each attended.  During this meeting, it was noted that "Dr. Tabuteau then reviewed the Company's research and development data and clinical trial status for each of the Company's clinical programs, including proposed NDA filings and the 74-day response letter

---

[7]    Further, as the court held in the Securities Class Action, "[t]he Company has a limited CNS portfolio, of which AXS-07 was a core product, and the one closest to commercialization." Securities Class Action, ECF No. 90, at 18.  In other words, it was mission-critical for the Company to have AXS-07 be approved by the FDA. Thus, the Board's failure to act upon the information it had regarding AXS-07 and/or effectively oversee the development of the Company's core product is evident.

received from the FDA, as set forth in the Board presentation that was previously circulated to the Board. The Board asked questions and discussed at length." AXSM_DERIV_0000248.

142.    On August 13, 2021, the Board held a meeting in which Defendants Tabuteau, Coleman, Jeffs, and Saad each attended. Also at the meeting were members of management, including Defendants Pizzie and Jacobson. During this meeting, the following was discussed:

**Research and Development and Clinical Update**

Dr. Tabuteau, Dr. O'Gorman and Dr. Jones then reviewed the Company's research and development data and clinical trial status for each of the Company's clinical programs including proposed NDA filings, as set forth in the Board presentation that was previously circulated to the Board. The Board asked questions and discussed with management. No formal action was taken at this time.

**Medical Affairs**

Dr. Tabuteau and Dr. O'Gorman then reviewed the Company's medical affairs. The Board asked questions and discussed with management. No formal action was taken at this time.

AXSM_DERIV_0000292.

143.    On November 12, 2021, the Board held a meeting in which Defendants Tabuteau, Coleman, Jeffs, and Saad attended. Members of management were also in attendance, including Defendants Pizzie and Jacobson.  At this meeting, "Dr. Tabuteau then provided an executive overview of the Company. The Board asked questions and discussed with management. No formal action was taken at this time." AXSM_DERIV_0000411. Also at this Board meeting, the following was discussed:

**Research and Development and Clinical Update**

Dr. Tabuteau and Dr. Jones then reviewed the Company's research and development data and clinical trial status for each of the Company's clinical programs, including proposed NDA filings, as set forth in the Board presentation that was previously circulated to the Board. The Board asked questions and discussed with management. No formal action was taken at this time.

AXSM_DERIV_0000411.

144. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████.

145.    On February 25, 2022, the Board held a meeting which Defendants Tabuteau, Coleman, Jeffs, and Saad each attended. Members of management also attended, including Defendants Pizzie and Jacobson. During this meeting, "Dr. Tabuteau then provided an executive overview of the Company. The Board asked questions and discussed with management." AXSM_DERIV_0000526. The following was also discussed:

**FDA Feedback**

Dr. Tabuteau then reviewed any feedback or correspondence the Company received from the FDA to date. The Board asked questions and discussed with management. No formal action was taken at this time.

**Research and Development and Clinical Update**

Dr. Tabuteau and Dr. Jones then reviewed the Company's research and development data and clinical trial status for each of the Company's clinical programs, including proposed NDA filings, as set forth in the Board presentation that was previously circulated to the Board. The Board asked questions and discussed with management. No formal action was taken at this time.

**CMC Update**

Mr. Jacobson then reviewed the Company's chemistry, manufacturing and controls update. The Board asked questions and discussed with management. No formal action was taken at this time.

AXSM_DERIV_0000526.

146. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████.

147.    On April 22, 2022, the Board held a meeting in which Defendants Tabuteau, Coleman, Jeffs, and Saad each attended. Members of management, including Defendants Pizzie and Jacobson, also attended. During this meeting, "Dr. Tabuteau then provided an executive overview of the Company. The Board asked questions and discussed with management." AXSM_DERIV_0000661. Also during this Board meeting, the following was discussed:

**FDA Feedback**

Dr. Tabuteau then reviewed any feedback or correspondence received from the FDA to date. The Board asked questions and discussed with management. No formal action was taken at this time.

**CMC Update**

Mr. Jacobson then reviewed the Company's chemistry, manufacturing and controls update. The Board asked questions and discussed with management. No formal action was taken at this time.

**Commercialization Update**

Ms. Englebert then reviewed the Company's commercial readiness and future plans. The Board asked questions and discussed with management. No formal action was taken at this time.

AXSM_DERIV_0000661-62.

148.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

H.    **The Truth Begins to Emerge While the Individual Defendants Continue to Issue Materially Misleading Statements**

149.    On November 5, 2020, Axsome announced that it would submit its NDA in the first quarter of 2021, one quarter later than expected, "to allow for inclusion of supplemental

39

manufacturing information to ensure a robust submission package." On this news, the Company's stock price fell $5.22 per share, or 7%, to close at $69.51 per share on November 5, 2020.

150. The same day, the Company held a conference call with analysts and investors to discuss its third quarter 2020 financial results. During the call, Defendants Tabuteau and Jacobson reassured that the additional information was to ensure a robust submission and did not reflect any manufacturing issues. Specifically, defendant Jacobson stated: "So just want to be clear, this is not the result of the manufacturing or stability issue or anything like that. . . . [W]e will have data available, that we think would add to the submission given [it's] a novel delivery technology. And so that will just allow us to make the package as robust as possible." Defendant Tabuteau assured that this was "standard" manufacturing information, stating: "[T]his is standard information when you manufacture additional batches. . . . And while we already have very long-term stability data on other batches, we think that because of the unique nature of the delivery technology, this can only help to make the submission robust and assure that there are no hiccups during review."

151. On March 1, 2021, the Individual Defendants caused Axsome to issue a press release announcing its fourth quarter and full year 2020 financial results, including that the Company "had successful pre-NDA meetings with the FDA . . . for AXS-07 in migraine" and is "nearing submission of the NDA for AXS-07 in the acute treatment of migraine, which is expected early in the second quarter."

152. On May 10, 2021, the Individual Defendants caused Axsome to issue a press release announcing its first quarter 2021 financial results. Therein, the Company stated that "Axsome is compiling the NDA for AXS-07 for the acute treatment of migraine, which is on track for submission to the FDA in the second quarter 2021."

40

153.    On May 10, 2021, Axsome filed its 1Q2021 10-Q. Defendants Tabuteau and Pizzie signed the filing and executed the accompanying Sarbanes-Oxley Act of 2002 ("SOX") certifications attesting to the accuracy of its contents. The 1Q2021 10-Q cautioned that the FDA approval process is "time consuming and inherently unpredictable," and noted that "[d]uring the course of review, the FDA may also request or require additional CMC, or other data and information, and the development and provision of these data and information may be time consuming and expensive." The filing further explained that "in connection with the chemistry, manufacturing, and controls (CMC) data necessary for our NDA filing and approval, we will need to conduct stability studies and provide stability data to establish appropriate retest or expiration dating period."

154.    The 1Q2021 10-Q also incorporated by reference the disclosures in Axsome's 2020 10-K. As a result, it repeated the assertion that "existing suppliers of our product candidate active pharmaceutical ingredients and finished products will be capable of providing sufficient quantities of each to meet our clinical trial supply needs." The filing further cautioned that "[i]f the manufacturers upon whom we rely fail to produce our product candidates in the volumes that we require on a timely basis, . . . we may face delays in the development and commercialization of, or be unable to meet demand for, our products and may lose potential revenues." The Company also warned that "[i]f our existing third-party manufacturers, or the third parties that we engage in the future to manufacture a product for commercial sale or for our clinical trials, should cease to continue to do so for any reason, we likely would experience delays in obtaining sufficient quantities of our product candidates for us to meet commercial demand or to advance our clinical trials while we identify and qualify replacement suppliers." The 2020 10-K similarly cautioned that "if for any reasons [Axsome is] unable to obtain adequate supplies of our product candidates

41

or the drug substances used to manufacture them, it will be more difficult for us to develop our product candidates and compete effectively."

155.   On August 9, 2021, the Individual Defendants caused Axsome to issue a press release announcing its second quarter 2021 financial results, including that the Company "successfully filed [its] NDA for AXS-07 for the acute treatment of migraine in the second quarter[.]"

156.   The same day, Axsome held a conference call with investors and analysts to discuss its second quarter 2021 results. Defendants Tabuteau and Jacobson participated on behalf of the Company. During the call, an analyst—referencing the manufacturing problems that had significantly delayed FDA approval and commercialization of AXS-05—observed that AXS-07 was being manufactured at the same facility as AXS-05. In response, Defendant Jacobson stated:

> So for the manufacturing process for AXS-07, that actually is a bit more complicated and there are two facilities that we utilized for the manufacturer of the drug product. The drug -- the API's are also available under open DMF too in the U.S. And of the two facilities that we used for drug product manufacturing, one of them is the same that we used for AXS-05.

157.   Also on August 9, 2021, Axsome filed its quarterly report on Form 10-Q with the SEC, reporting financial and operational results for the quarter ended June 30, 2021 ("2Q2021 10-Q"). Defendants Tabuteau and Pizzie signed the 2Q2021 10-Q and provided the accompanying SOX certifications. The filing cautioned that the FDA approval process is "time consuming and inherently unpredictable," noting that "[d]uring the course of review, the FDA may also request or require additional CMC, or other data and information, and the development and provision of these data and information may be time consuming and expensive." The 2Q2021 10-Q further stated that "in connection with the chemistry, manufacturing, and controls (CMC) data necessary for our

NDA filing and approval, we will need to conduct stability studies and provide stability data to establish appropriate retest or expiration dating period."

158.    The 2Q2021 10-Q also incorporated by reference the disclosures in Axsome's 2020 10-K. As a result, it repeated the assertion that "existing suppliers of our product candidate active pharmaceutical ingredients and finished products will be capable of providing sufficient quantities of each to meet our clinical trial supply needs." The filing further cautioned that "[i]f the manufacturers upon whom we rely fail to produce our product candidates in the volumes that we require on a timely basis, . . . we may face delays in the development and commercialization of, or be unable to meet demand for, our products and may lose potential revenues." The Company also warned that "[i]f our existing third party manufacturers, or the third parties that we engage in the future to manufacture a product for commercial sale or for our clinical trials, should cease to continue to do so for any reason, we likely would experience delays in obtaining sufficient quantities of our product candidates for us to meet commercial demand or to advance our clinical trials while we identify and qualify replacement suppliers." The 2020 10-K similarly stated that "if for any reasons [Axsome is] unable to obtain adequate supplies of our product candidates or the drug substances used to manufacture them, it will be more difficult for us to develop our product candidates and compete effectively."

159.    On September 14, 2021, the Individual Defendants caused Axsome to announce that the FDA had accepted the AXS-07 NDA:

> The NDA is supported by results from two Phase 3 randomized, double-blind, controlled trials of AXS-07 in the acute treatment of migraine, the MOMENTUM and INTERCEPT trials, which demonstrated statistically significant elimination of migraine pain with AXS-07 compared to placebo and active controls.

160.    On November 8, 2021, Axsome filed its quarterly report on Form 10-Q with the SEC, reporting financial and operational results for the quarter ended September 30, 2021

43

("3Q2021 10-Q"). Defendants Tabuteau and Pizzie signed the 3Q2021 10-Q and provided the required SOX certifications. The filing warned that the FDA approval process is "time consuming and inherently unpredictable," noting that "[d]uring the course of review, the FDA may also request or require additional CMC, or other data and information, and the development and provision of these data and information may be time consuming and expensive." The 3Q2021 10-Q further stated that "in connection with the chemistry, manufacturing, and controls (CMC) data necessary for our NDA filing and approval, we will need to conduct stability studies and provide stability data to establish appropriate retest or expiration dating period." The filing also disclosed that "[t]he FDA has set a PDUFA target action date for the AXS-07 NDA of April 30, 2022."

161.    The 3Q2021 10-Q also incorporated by reference the disclosures in Axsome's 2020 10-K. Accordingly, it repeated the assertion that "existing suppliers of our product candidate active pharmaceutical ingredients and finished products will be capable of providing sufficient quantities of each to meet our clinical trial supply needs." The filing further warned that "[i]f the manufacturers upon whom we rely fail to produce our product candidates in the volumes that we require on a timely basis, . . . we may face delays in the development and commercialization of, or be unable to meet demand for, our products and may lose potential revenues." The Company again cautioned that "[i]f our existing third party manufacturers, or the third parties that we engage in the future to manufacture a product for commercial sale or for our clinical trials, should cease to continue to do so for any reason, we likely would experience delays in obtaining sufficient quantities of our product candidates for us to meet commercial demand or to advance our clinical trials while we identify and qualify replacement suppliers." The 2020 10-K similarly warned that "if for any reasons [Axsome is] unable to obtain adequate supplies of our product candidates or

the drug substances used to manufacture them, it will be more difficult for us to develop our product candidates and compete effectively."

162. On March 1, 2022, the Individual Defendants caused Axsome to announce its fourth quarter and full year 2021 financial results, stating in relevant part:

> Axsome's NDA for AXS-07 for the acute treatment of migraine is currently under review by the FDA with a PDUFA target action date for the NDA of April 30, 2022. The FDA previously notified the Company that, due to COVID-19 pandemic-related travel restrictions, they may be unable to complete a required inspection of a contract manufacturing facility, located in the United States, prior to the PDUFA date. Axsome has since been informed by the FDA that it does not anticipate any issues with completing this facility inspection prior to the AXS-07 PDUFA date.

163. The same March 1, 2022 press release quoted Defendant Tabuteau as stating that "2021 was a year of continued progress which has put us in a position to potentially launch two new investigational medicines for patients living with depression and migraine," and highlighting that "the April 30 PDUFA date for our NDA for AXS-07 in the acute treatment of migraine [that] is approaching."

164. Also on March 1, 2022, Axsome filed its annual report on Form 10-K with the SEC, reporting financial and operating results for the quarter and year ended December 31, 2021 (the "2021 10-K"). Defendants Tabuteau and Pizzie signed the 2021 10-K and provided accompanying SOX certifications.

165. The 2021 10-K stated: "[w]e believe that our existing suppliers of our product candidate active pharmaceutical ingredients and finished products will be capable of providing sufficient quantities of each to meet our clinical trial supply needs." This statement was particularly false and misleading because the Individual Defendants knew that Axsome's "existing suppliers" were already experiencing manufacturing problems for a planned study and therefore did not "believe that our existing suppliers . . . will be capable of providing sufficient quantities of each to meet our clinical trial supply needs." Indeed, as the court in the Securities Class Action found,

45

these and similar statements about AXS-07 (as described *supra*) were misleading because they created an impression that the Company was not facing supply issues, when, in reality, the SAC alleges that Axsome was unable to produce sufficient AXS-07 for at least a year.

166.    The 2021 10-K further stated that "[i]f the manufacturers upon whom we rely fail to produce our product candidates in the volumes that we require on a timely basis, . . . we may face delays in the development and commercialization of, or be unable to meet demand for, our products and may lose potential revenues" and that "[i]f our existing third-party manufacturers, or the third parties that we engage in the future to manufacture a product for commercial sale or for our clinical trials, should cease to continue to do so for any reason, we likely would experience delays in obtaining sufficient quantities of our product candidates for us to meet commercial demand or to advance our clinical trials while we identify and qualify replacement suppliers." Although Axsome presented these disclosures as "risks related to our dependence on third parties," they were materially misleading because, although framed them as hypothetical future risks, Axsome was already experiencing these very problems with its third-party manufacturer for AXS-07. Indeed, prior to the filing of this 2021 10-K, the Individual Defendants already knew that the FDA    had    issued ██████████████████████████████████████ ████████████████████.

167.    By choosing to speak about the NDA for AXS-07, the Director Defendants were also required to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The Director Defendants' failure to disclose the known CMC issues violated Item 303 because these issues represented known trends or uncertainties that were likely

to have a material unfavorable impact on the Company's business and financial results. 17 C.F.R. § 229.303.

168. The above-referenced statements were materially misleading because they failed to disclose: (1) that the Company failed to adhere to proper CMC practices for tis AXS-07 manufacturing process; and (2) that, as a result, there was a substantial risk to approval of the AXS-07 NDA.

## I.     The Truth Fully Emerges

169. On April 25, 2022, before the market opened, Axsome announced that the FDA had informed the Company that "chemistry, manufacturing, and controls ("CMC") issues identified during the FDA's review of the Company's New Drug Application ("NDA") for its AXS-07 product candidate for the acute treatment of migraine are unresolved." As a result, "the Company expects to receive a Complete Response Letter with respect to this NDA on or about the Prescription Drug User Fee Act target action date of April 30, 2022."

170. On this news, the Company's stock price fell $8.60, or 22%, to close at $30.50 per share on April 25, 2022.

171. On May 2, 2022, Axsome announced it had received a Complete Response Letter from the FDA regarding the AXS-07 NDA for the acute treatment of migraine. In a press release, the Company stated:

> [T]he Company has received a [CRL] from the [FDA] regarding its [NDA] for AXS-07 for the acute treatment of migraine. The CRL did not identify or raise any concerns about the clinical efficacy or safety data in the NDA, and the FDA did not request any new clinical trials to support the approval of AXS-07.
>
> The principal reasons given in the CRL relate to [CMC] considerations. The CRL identified the need for additional CMC data pertaining to the drug product and manufacturing process. Axsome believes that the issues raised in the CRL are addressable and intends to provide potential timing for a resubmission following consultation with the FDA.

47

## VI.   DAMAGES TO THE COMPANY

172.   As a direct and proximate result of the Individual Defendants' conduct, Axsome has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a)   Any funds paid to settle the Securities Class Action;

b)   Loss of market capital;

c)   Loss related to failed clinical trials; and

d)   Costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Axsome.

173.   In addition, Axsome's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

174.   The actions complained of herein have irreparably damaged Axsome's corporate image and goodwill.  For at least the foreseeable future, Axsome will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Axsome's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

175.   Plaintiffs bring this action derivatively in the right and for the benefit of Axsome to redress injuries suffered, and to be suffered, by Axsome as a direct result of breaches of fiduciary duty by the Individual Defendants and other wrongful conduct as alleged herein.

176.   Plaintiffs will adequately and fairly represent the interests of Axsome in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

177. Plaintiffs have continuously been shareholders of Axsome at times relevant to the wrongdoing complained of and are current Axsome shareholders. Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

178. Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

179. When this action was filed, Axsome's Board consisted of Defendants Tabuteau, Jeffs, Coleman, and Saad (*i.e.*, the Director Defendants). Thus, Plaintiffs are required to show that a majority of the Director Defendants, *i.e.*, two (2), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

180. The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

181. Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

182.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

183.    Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

184.    As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

185.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

186.    Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various

false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

187. Further, as alleged herein, Tabuteau, Jeffs, Coleman, and Saad had actual knowledge of the truth concealed from stockholders. They therefore actually knew the truth about AXS-07's prospects for FDA approval, they issued or participated in the issuance of the misleading statements alleged herein, and they did so knowing that the statements were misleading. As a result, Tabuteau, Jeffs, Coleman, and Saad face a substantial likelihood of liability.

188. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

189. Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for the Company for any of the misconduct alleged herein.

**Defendant Tabuteau**

190. Defendant Tabuteau is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent. As such, Defendant Tabuteau cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

191. As CEO, Defendant Tabuteau also fails the stock exchange bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Tabuteau could not objectively and disinterestedly consider a demand to sue the Individual Defendants and

51

any demand upon Defendant Tabuteau is therefore futile.

192.    Defendant Tabuteau also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Tabuteau is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

193.    In addition, Defendant Tabuteau receives lucrative compensation in connection with his employment with the Company. Defendant Tabuteau is not independent from the directors serving on the Compensation Committee and who are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Tabuteau. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Tabuteau could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

194.    Because of Defendant Tabuteau's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Tabuteau is unable to comply with his fiduciary duties and prosecute this action. Defendant Tabuteau is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**Defendants Jeffs, Coleman, and Saad**

195.    Defendants Jeffs, Coleman, and Saad also served as members of the Audit Committee at relevant times. As such they are responsible for the integrity of Axsome's

disclosures. The AXS-07 NDA presented a critical opportunity for the Axsome's transition to a commercial company. In their capacities as Audit Committee members, Defendants Jeffs, Coleman, and Saad reviewed and approved the materially misleading statements and allowed them to be disseminated in Axsome's SEC filings and other disclosures. Thus, Defendants Jeffs, Coleman, and Saad breached their fiduciary duties  and are not disinterested, and demand is excused as to them.

196.    In addition, Defendant Tabueatu owns, directly or through Antecip Capital LLC,[8] approximately 31.6% of the Company's shares. As such, Defendant Tabuteau has significant voting power. This means that Defendant Tabuteau has the ability to influence, and likely determine the outcome of, any shareholder vote, including votes as to the election and re-election of directors. As such, Defendants Jeffs, Coleman, and Saad could not reasonably consider a demand to sue Defendant Tabuteau for his breaches of fiduciary duty and other wrongful conduct because that could impact whether Defendants Jeffs, Coleman, and Saad are re-elected to the Board following a shareholder vote.[9]

**Demand on the Current Board is also Futile**

197.    Since the filing of the Action, one director (non-party Susan Mahony) has joined the Board, increasing its size to five. Because Plaintiffs' claims have been validly in litigation since July 2022, demand futility is to be measured against the Board in effect at that time. However, in

---

[8]    Defendant Tabuteau is the managing member of Antecip Capital LLC and exercises sole dispositive and voting power over the shares owned by it.

[9]    This is underscored by the Company's 2025 shareholder meeting. In deciding whether to re-elect Defendant Jeffs to the Board, 27.3 million of the shares represented at the meeting voted in favor of re-electing Defendant Jeffs. Without Defendant Tabuteau's support, only 10.6 million of the shares represented at the meeting would have been in favor of electing Defendant Jeffs. If Defendant Tabuteau voted against re-electing Defendant Jeffs instead of abstaining, then Defendant Jeffs would not have been re-elected (*i.e.*, 10.6 million in favor v. 16.6 million held by Tabuteau).

the event that demand futility is measured against the Current Board (*i.e.*, the Director Defendants with non-party Mahony), then demand is still excused as futile because the Director Defendants constitute a majority of the Board and demand is excused as to the Director Defendants, as discussed above.

198.    Further, non-party Mahony could not consider a demand adverse to Defendant Tabuteau for the same reason as discussed above regarding Defendant Tabuteau's significant influence and voting power and the resulting impact that has on shareholder votes, including in the re-election of directors.

**Additional Reasons Demand is Excused**

199.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

200.    The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

201.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and

disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

202. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

203. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

204. Publicly traded companies, such as Axsome, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's

damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event.

205.     Accordingly, each of the Director Defendants, and at least a majority of them (or a majority of the Current Board), cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

206.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

207.     The Individual Defendants each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Axsome's business and affairs, particularly with respect to issues as fundamental as public disclosures.

208.     The conduct by the Individual Defendants set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Axsome.

209.     In breach of their fiduciary duties owed to Axsome, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

210.     In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report Company's overall prospects.

56

211.    The Individual Defendants also failed to effectively oversee the development of the Company's mission-critical product and/or failed to act to the benefit of the Company in the face of red flags presented to them. As a result, the Company suffered a corporate trauma.

212.    Further, instead of acting on the red flags presented and/or effectively overseeing the development of the Company's core product, the Individual Defendants appeared to prioritize profit and milestone achievement over proper development, resulting in corner-cutting practices and the Company suffering significant harm.

213.    As a direct and proximate result of the breaches of their fiduciary obligations by the Individual Defendants, Axsome has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, the Individual Defendants are each liable to the Company.

## COUNT II

### (Against Defendants Tabuteau, Pizzie, O'Gorman, and Laliberte for Contribution For Violations of Sections 10(b) and 21D of the Exchange Act)

214.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

215.    The conduct of Defendants Tabuteau, Pizzie, O'Gorman, and Laliberte, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

216.    Axsome is named as a defendant in related securities fraud lawsuit that allege and assert claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If Axsome is found liable for violating the federal securities laws, the Company's liability will arise

57

in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

217.    As officers, directors and otherwise, Defendants Tabuteau, Pizzie, O'Gorman, and Laliberte had the power or ability to, and did, control or influence, either directly or indirectly, Axsome's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

218.    Defendants Tabuteau, Pizzie, O'Gorman, and Laliberte are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

219.    Defendants Tabuteau, Pizzie, O'Gorman, and Laliberte have damaged the Company and are liable to the Company for contribution.

220.    No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of Axsome, demand judgment as follows:

A.    Declaring that Plaintiffs may maintain this action on behalf of Axsome and that Plaintiff is an adequate representative of the Company;

B.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of their breaches of fiduciary duties;

C.    Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Axsome;

58

D.      Directing Axsome to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Axsome and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen Axsome's oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of Axsome to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Axsome has an effective remedy;

F.      Awarding to Axsome restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

59

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Dated: November 25, 2025

Respectfully submitted,

/s/*Benjamin I. Sachs-Michaels*
**GLANCY PRONGAY & MURRAY LLP**
Matthew M. Houston
Benjamin I. Sachs-Michaels
745 Fifth Avenue, 5th Floor
New York, New York 10151
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com
        prajesh@glancylaw.com

/s/*Gregory M. Egleston*
**GAINEY McKENNA & EGLESTON**
Gregory M. Egleston
Thomas J. McKenna
260 Madison Avenue, 22nd Fl.
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: egleston@gme-law.com
        tjmckenna@gme-law.com

*Co-Lead Counsel for Plaintiffs*